**HANLON & WILSON COMPANY,**
**Petitioner,**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent.**

No. 83-3450.

United States Court of Appeals,
Third Circuit.

Argued May 25, 1984.

Decided June 29, 1984.

Henry J. Wallace, Jr. (argued), Tracey G. Benson, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for petitioner.

Joseph A. Oertel (argued), William A. Lubbers, General Counsel, John E. Higgins, Jr., Deputy General Counsel, Robert E. Allen, Associate General Counsel, Elliott Moore, Deputy Associate General Counsel, National Labor Relations Board, Washington, D.C., for respondent.

Before GARTH and SLOVITER, Circuit Judges, and FISHER, District Judge.*

---

\* Honorable Clarkson S. Fisher, Chief Judge of the United States District Court for the District of New Jersey, sitting by designation.

OPINION OF THE COURT

GARTH, Circuit Judge:

This case is before us on a petition of Hanlon and Wilson Company ["H & W"] for review, and cross-application by the General Counsel for enforcement, of an order of the National Labor Relations Board ["NLRB" or "Board"] which found H & W to have committed unfair labor practices in violation of section 8(a)(1) and (3) of the National Labor Relations Act (as amended), 29 U.S.C. § 158(a)(1) & (3) (1976) ["Act"].

This appeal arises out of three unfair labor practice charges filed with the Board and consolidated for hearing. One of the charges concerns five employee terminations and two suspensions which occurred in November and December 1980 under H & W's absenteeism policy. The other two charges concern employee Mark Cole and involve incidents occurring in February and March 1981. Following four days of hearings, the Administrative Law Judge ["ALJ"] concluded that:

1. the discharge of Donald Rugito, Charles Pershing, and Gregory Krivakuca violated section 8(a)(3) and (1) of the Act because H & W showed "disparate treatment" of these three employees, discriminating against them because of their protected activities by rejecting "valid excuses" for multiple absences.

2. the suspension of Mark Cole violated section 8(a)(3) and (1) of the Act since he was suspended "because he had engaged in protected activities."

3. by creating the impression of surveillance of employees' union activities H & W violated section 8(a)(1) of the Act.

4. all other allegations in the complaint had not been substantiated.[1]

(App. 27). By decision and order dated September 21, 1983, the Board affirmed the rulings, findings, and conclusions of the ALJ in all material respects.

Having carefully examined the entire record in this case, we conclude that there is substantial evidence to support the Board's findings as to the suspension of Mark Cole, improper surveillance, and the discharge of Donald Rugito, and we will enforce the Board's order as to Rugito and Cole[2] and the cessation of surveillance activities. As to Charles Pershing and Gregory Krivakuca, we conclude that there was not substantial evidence in the record to support the Board's findings and we will not enforce the Board's order as to Pershing or Krivakuca. Rather, we will grant H & W's petition for review as it pertains to those two individuals.

I.

A.

Petitioner H & W is a Pennsylvania corporation engaged in the manufacture and sale of aircraft exhaust systems and related products. As relevant to this appeal, the forty production and maintenance employees at H & W's Penn Township, Pennsylvania plant were represented for collective bargaining purposes by H & W Employees Union Local 711. The terms and conditions of employment for bargaining unit employees were governed by a collective bargaining agreement between H & W and Local 711 which became effective on February 8, 1980. The agreement was supplemented by H & W workrules and safety rules which have been in effect since 1966. The validity and effect of these rules is not in dispute. The rules were posted in the workplace and a copy given to each employee individually by the Personnel Di-

---

1. The ALJ found no violation of the Act with regard to (1) the terminations of Robert A. Broker, Roger Cottrell (App. 18–20), and Mark Cole (App. 24–26); (2) two suspensions of Gregory Krivakuca (App. 24); (3) an alleged discriminatory work rule (App. 14–15); (4) an alleged refusal to furnish safety and health records (App. 15–16); and (5) an alleged refusal to accept grievances (App. 16–17).

2. The Board ordered H & W to "[m]ake whole Mark Cole for any loss of pay and other benefits he suffered as a result of the suspension on March 3 through March 5, 1981, (App. 28), and to post a notice to H & W employees which recited H & W's intention to comply with this order." (App. 31).

rector at the time of hiring. At the Union's request, these rules were reviewed by both parties at the time the latest contract was negotiated, and on February 8, 1980, the work rules were repromulgated and the Union was told that the rules would be thereafter enforced on a stricter basis (App. 539).

Of particular importance to this appeal is Rule 30, concerning progressive discipline for excessive absenteeism. Footnote 1 to Rule 30 explains the "Criteria for Habitual Absenteeism." [3] In the instant proceedings, we are primarily concerned with the provision of the work rules which provides for an employee's discharge if there has been an accumulation of nine unexcused absences within the calendar year. According to the unrebutted testimony of H & W Personnel Manager Betty Barron, "[w]e decided in the year 1980 we would clamp down on all phases of the work rules. And this included not only absenteeism, which

was one of our problems." (App. 536). Her testimony indicated that H & W's absenteeism policy as outlined in Rule 30 is administered in a consistent, albeit somewhat informal, manner.[4] An employee's third unexcused absence triggers the disciplinary action, and there is usually a time lag between the third absence and the preparation of the disciplinary slip because it is H & W's policy to give employees a "reasonable time" (a "couple of weeks") in which to bring in an excuse for a given absence (App. 523), although ninety percent or more of the employees were said to bring in excuses the next day or the day after (App. 579).

This absenteeism policy and procedure provides the focal point of the majority of the unfair labor practice charges which make up the substance of this appeal. Following the resignation or dismissal[5] of four key Union officers in September 1980,

---

**3.** Footnote 1 states:
A. An employee who fails to notify the Company when absent for five (5) or more consecutive days will be considered as a voluntary quit.
B. If an employee is absent, REPORTED OFF OR NOT REPORTED OFF, nine (9) times within a year, he will be discharged. The exceptions to this rule are:
1. An employee requests and has been granted a sick leave.
2. Bereavement.
3. Jury Duty.
4. U.S. Reserve Camp.
5. Workmen's Compensation cases.
6. Leave of absence.
7. Doctor's excuse.
C. Leaving work more than thirty (30) minutes prior to quitting time will be considered unauthorized absence from the plant. If an employee leaves early more than nine (9) times in a year, he will be discharged. The exceptions will be dentist, doctor appointments with an excuse from the doctor, sudden illness with an excuse from the doctor or for extreme emergencies as determined by the Company.
D. The steps that will be followed leading to discharge for absenteeism or leaving work early are:
(1) Three days disciplinary layoff after the third absence or early leave.
(2) One week disciplinary layoff after the next three absences or early leaves.
(3) Disciplinary discharge after the next three absences or early leaves.

E. Absences will be considered on a yearly basis beginning January 1st and ending December 31st.
(App. 701–02).

**4.** When a shop employee is absent, the foreman so indicates on the individual's timecard, which is sent to the accounting department where the information is marked on a buff payroll card. The buff card is then sent to the receptionist who marks the information concerning absenteeism on a large white card for each employee. After an employee has three unexcused absences, the receptionist notifies Mrs. Barron. If an acceptable excuse for absence has not been received for the employee within a "reasonable time"—a "couple of weeks" at the most—then the receptionist prepares the appropriate disciplinary slip (App. 523–24, 623). The slip is forwarded to the shop, where the general foreman determines when a suspension should be scheduled to best accommodate production needs, and so indicates on the slip, which is returned to Mrs. Barron for her information and approval. Only then is the slip returned to the shop to be given to the employee at the end of the workday.

**5.** Union President Matucci resigned his employment September 12, 1980. Three other Union officers were terminated for their role in a wildcat strike that occurred September 8–12, 1980. Grievances arising out of those terminations were the subject of arbitration proceedings and are not at issue here.

the Union appointed temporary Union officials to file grievances on behalf of the discharged officers. The record reveals that all of those sought to be or actually appointed to Union office in the Fall of 1980 had serious absenteeism problems,[6] and two of them (Rugito and Krivakuca) had been terminated previously for absenteeism and eventually rehired. As relevant to this appeal, the General Counsel argued—and the ALJ agreed—that the subsequent terminations of Rugito, Krivakuca, and Pershing and the suspension of Cole which resulted from H & W's strict enforcement of its absenteeism rules was motivated by H & W's desire to rid itself of these "more aggressive" Union officers, thereby violating section 8(a)(3) and (1) of the Act.

#### B.

Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1) (1976), makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7 of the Act]." Section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3), makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment ... to encourage or discourage membership in any labor organization ...." Thus, the employer may not intimidate or coerce employees with respect to protected activities, *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 45, 46, 57 S.Ct. 615, 628, 81 L.Ed. 893 (1937), under the guise of exercising the employer's right to select or discharge its employees. To prove an unfair labor practice, the General Counsel of the Board must meet its burden "upon the preponderance of the testimony taken," 29 U.S.C. § 160(c), and must establish its case by "substantial evidence." "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established."

*NLRB v. Columbia Enameling & Stamping Co.*, 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660 (1939).

■ The resolution of unfair labor practice charges under section 8(a)(3) of the Act involving "dual motive" discharge or discipline—in which the decision to discharge or discipline an employee may be motivated both by opposition to protected activities and by a legitimate business reason—is governed by the legal standard set forth in *Wright Line, a Division of Wright Line, Inc.*, 251 N.L.R.B. 1083 (1980), *enforced on other grounds*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), *cited with approval*, *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). Under the *Wright Line* test, the General Counsel must initially make a prima facie showing of discriminatory discharge by supporting the inference that protected conduct was "a motivating factor" in the employer's discipline decision. Once the General Counsel has established its prima facie case, "the burden of persuasion shifts to the employer to show that the employee would have been discharged in any event because of unprotected conduct." *Champion Parts Rebuilders, Inc. v. NLRB*, 717 F.2d 845, 849 n. 6 (3d Cir.1983). Having laid out the proper legal framework by which to analyze the actions taken by H & W, we now proceed to examine the Board's order.

#### II.

##### A.   Charles Pershing

Charles Pershing worked for H & W as a welder from March 21, 1977 until December 16, 1980. The ALJ found that he was only "remotely connected" with the Union (App. 22). Pershing characterized himself as a passive Union supporter: he paid his dues but he refused appointment to Union office because it would be a "hassle."

---

**6.**

| Name | Position | Unexcused Absences |
|------|----------|--------------------|
| D. Rugito | V.P. | 8 |
| G. Krivakuca | Secretary | 3 |
| W. Coyle | President | 6 |

| Name | Position | Unexcused Absences |
|------|----------|--------------------|
| B. May | Treasurer | 4 |
| R. Broker | Safetyman | 8 |
| C. Pershing* | Grievanceman | 7 |

*declined appointment

(App. 234). Pershing accumulated at least nine unexcused absences as of November 17, 1980.[7] On December 16, 1980 Pershing was terminated for excessive absenteeism. Pershing claimed that his September 23, 1980 absence should have been excused, explaining that he accompanied his son to Children's Hospital in Pittsburgh for thyroid testing, that he forgot to get an excuse, and that his supervisor (Giannotti) had said that it would be all right if he didn't turn one in (App. 223–24). Pershing did obtain an excuse for his September 23rd absence on December 17, the day after he was discharged, but when he tried to turn it in he was told that it was "too late." (App. 228). Pershing also claimed that at the time of this discharge, his supervisor said "I hate to see this happen to you, but there is nothing I can do about it. It is the way the Company wants it." (App. 222).

The ALJ accepted the General Counsel's argument that H & W discharged Pershing to legitimize its discharges of union activists. In support of that conclusion, the ALJ relied on evidence of Pershing's "12 unexcused absences" as of November 17, 1980, for which he was not discharged until December 16, 1980, and then "only after a Board agent had asked supervisor Barron on December 11 about Pershing's absenteeism record." (App. 22). The inference which the ALJ sought to draw from that incident was that Pershing would not have been discharged had the Board agent made no inquiry. Ostensibly, by inquiring as to Pershing's absences, H & W was then alerted to the fact that Pershing was not being treated in the same fashion as the other employees who were discharged for excessive absenteeism. In order to justify the discharges of those such as Rugito and Krivakuca, Pershing too was then discharged. We point out later, however, that the factual basis needed to support this rather tortured reasoning and inference is faulty.

The ALJ also relied on its finding that H & W had never rejected a written excuse as untimely prior to the time that it rejected a co-worker's (Rugito's)[8] excuse on November 17, 1980, reasoning that "[b]ut for [H & W's] effort to be consistent with its discriminating treatment of Rugito, Pershing would have been permitted to justify his absence with the statement from the hospital." (App. 22–23). We find that there is not substantial evidence in the record to support this reasoning.

First, the slip notifying Pershing of his suspension pending discharge was prepared on December 10, 1980, approximately three weeks after his last unexcused absence. According to unrebutted testimony at trial, a time lag of three weeks such as this is normal at H & W. As explained by Barron, the fact that this was a holiday period may have accounted in part for the time lag in this case (App. 589). Second, as we have earlier observed, the suspension slip was prepared on December 10, one day *prior* to the Board agent's inquiry about Pershing, rendering highly questionable the reliance placed on that circumstance by the ALJ. Third, although H & W had in the past accepted excuses *several* weeks after the absence, there was no evidence in the record of the company having accepted an excuse *eight* weeks after the absence. Fourth, supervisor Giannotti explained that his remark at the time he gave Pershing his suspension slip—that he was sorry but the Company wanted it that way—was similar to the remark he usually made when handing an employee a disciplinary slip (App. 666).

7. UNEXCUSED ABSENCES (1980)    DISCIPLINED

| 2/26 | 3/10 | 3/14 | 3/28 |
| 4/1 | 5/12 | 7/29 | 8/1 |
| 9/23 | 10/22 | 11/17 | 12/10 |

The ALJ found that Pershing had accumulated twelve unexcused absences at the time of his

discharge (App. 22), but it is not clear from the testimony at trial or the attendance card exhibit (App. 940) that Pershing had accumulated more than nine such absences.

8. Rugito was a co-worker of Pershing who was also fired for excessive absenteeism. We discuss the circumstances of Rugito's discharge in a later portion of this opinion.

More important perhaps is what the ALJ himself found as to Pershing's Union involvement. Section 8(a)(1) and (3) are designed to support an employee's protected activities, and no evidence exists in the record that Pershing ever participated in any protected, i.e., Union, activities. On the contrary, the ALJ admitted that Pershing was only "remotely connected" with the Union. The ALJ found instead that Pershing was discharged so that H & W could appear "consistent with its discriminatory discharge of Rugito." However, as we have previously observed, the General Counsel cannot establish its prima facie case by relying on mere speculation, which itself is dependent on a flawed factual basis. Since protected activities were not found to have been "a motivating factor" in the discharge of Pershing and since there is no evidence in the record to support the ALJ's speculation as to the reason for his discharge, we conclude that the ALJ's finding that H & W violated section 8(a)(1) and (3) of the Act in discharging Pershing is not supported by substantial evidence. We therefore will not enforce the Board's order as to Pershing.

## B. Mark Cole

### 1. *Suspension and Threats to Job Security*

Mark Cole was hired first as a laborer on April 28, 1980, subsequently moving to the machine shop as a trainee. On October 17, 1980 he was appointed a Union safetyman and in December he became vice president of the Union. On March 17, 1981, Cole was given a non-disciplinary discharge based on medical considerations. (App. 1072). The General Counsel challenged both that discharge and a prior three-day suspension given to Cole on February 23, 1981 (App. 1068), claiming that Cole was disciplined because of his protected activities.

The ALJ concluded that Cole's termination on March 17, 1981 was not the result of protected union activities but was rather due to medical reasons (App. 25–26). That finding is not at issue here. The ALJ concluded, however, that Cole's suspension on February 23, 1981 did violate the Act.

Cole was suspended for three days because he allegedly violated H & W's "leave early" rule on January 30, February 2, and February 6, 1981. *See* Subpart C of Footnote 1 to Rule 30, note 3 *supra.* Cole served the suspension on March 3–5, 1981. At trial, Cole testified that he left early on those three occasions to attend to Union business and that he did so with the reluctant permission of his supervisors, (Giannotti and Pyers). (App. 391). This testimony was not contradicted by either supervisor. In addition, the record is replete with uncontradicted testimony from Cole and others supporting the ALJ's finding that Cole was suspended because he had engaged in protected activities.

Cole testified that in response to his request for H & W safety records, supervisor Carlyle Bollman "told me that I better not ask for safety records anymore, not to worry about them, and that if I said anything else and asked any more about the safety records, that I could be out the door." (App. 357–60).

Similarly, Charles Derminer, another H & W employee, testified that "Jimmy Giannotti said that he [Cole] was causing a lot of trouble and he would like Mark to get off his back," (App. 339) and that he (Derminer) told Mark "to be very careful, that the Company would do anything that they could to get rid of him." (App. 341). Cole corroborated Derminer's testimony, adding "[t]hat is what all those officials told me in different ways and in different forms." (App. 366). With regard to a list of workplace hazards Cole presented to supervisor Giannotti, Cole testified that "Jim had told me that these complaints were ridiculous," (App. 352), and that "Jim Giannotti got mad and said that we were not here to harass each other but we were here to work with each other." (App. 354).

The ALJ credited each of the statements referred to above, and it is established that credibility decisions rest with the ALJ as long as he considers all relevant factors and sufficiently explains his resolu-

tions. *Edgewood Nursing Center, Inc. v. NLRB*, 581 F.2d 363, 365 (3d Cir.1978). This testimony satisfies us that there is substantial evidence in the record to support the ALJ's implicit conclusion that protected activities were a motivating factor in H & W's decision to suspend Cole and that Cole would not have been disciplined, i.e., suspended, because of unprotected conduct. This testimony also provides substantial evidence to support the ALJ's conclusion that H & W's threats to the effect that Cole's job was in jeopardy violated section 8(a)(1) of the Act.

We therefore will enforce those parts of the Board's order that required H & W to pay Cole for any loss of earnings and benefits he suffered as a result of the three-day suspension in March 1981, (App. 27–28), and that ordered H & W to cease and desist from "[t]hreatening its employees with the loss of jobs because of their union activities." (App. 28).

### 2. *Surveillance*

Cole testified that supervisors Bollman and Giannotti approached him in February 1981 and said: "Don't try scaring us with bringing in the steelworkers," and "We hear you are trying to get the steel workers in here." (App. 392).[9] The ALJ credited this testimony and found a violation of section 8(a)(1) of the Act based on the "impression of surveillance" that these statements supplied. Cole explained that he gave the conversation "no real affirmative thing" because his father was vice president of the steel workers union at the nearby Elliot Company. (App. 392). He also testified to having discussed the steel workers union with "a few people around the plant," but not with or in the presence of Giannotti or Bollman. (App. 394–95).

■ Conduct which gives the impression of surveillance violates section 8(a)(1) if that conduct reasonably tends to interfere with, restrain, or coerce employees in the exercise of their section 7 rights. There need not be actual interference or coercion to have a section 8(a)(1) violation. *United States Steel Corp. v. NLRB*, 682 F.2d 98, 103 (3d Cir.1982) (rejecting *per se* violation approach to surveillance of protected activities). "Creating the impression of surveillance of employees' efforts to form a union has been held to violate section 8(a)(1)." *Frito-Lay, Inc. v. NLRB*, 585 F.2d 62, 66 (3d Cir.1978).

■ The Board itself has stated its standard as

> We are not here concerned with whether this statement was true, or whether it proved actual surveillance. The significant fact ... is whether [the supervisor's] statement had a reasonable tendency to discourage the employees in exercising their statutory rights by creating the impression that he had sources of information about their union activity.

*Overnite Transportation Company*, 254 NLRB 132, 133 (1981), *quoting American National Stores, Inc.*, 195 NLRB 127 (1972). Here, the language attributed to H & W supervisors clearly gives an impression of surveillance. Although Cole's testimony would indicate that his union activities were not *actually* restrained or coerced by knowledge of possible surveillance by H & W supervisors, that surveil-

---

**9.** The testimony at trial was as follows:

> Q. Were you spoken to by any Company officials regarding the United Steel Workers Union?
> A. Yes, Carlyle Bollman and Jimmy Giannotti had approached me.
>
> \* \* \* \* \* \*
>
> A. And they told me, "Don't try scaring us with bringing in the steel workers."
> Q. To the best of your recollection, what did they say?
> A. Just "Don't try scaring us with the steel workers."

> Q. Well, how did the conversation begin?
> A. They came up to me and said, "We hear you are trying to get the steel workers in here."
>
> \* \* \* \* \* \*
>
> Q. What did they say; to the best of your recollection?
> A. "Don't try scaring us with the United States Steel Workers coming in here. It won't work."
> (App. 391–93).

lance could reasonably tend to coerce or restrain employees in the exercise of their right to organize. Again, credibility determinations are for the ALJ, and having found Cole's testimony to be credible, the ALJ could conclude that it was sufficient to support a violation of section 8(a)(1). Therefore, we will enforce that part of the Board's order which requires H & W to cease and desist from "[c]reating the impression among its employees that their union activities were under surveillance." (App. 28).

### C. Donald Rugito

Donald Rugito was employed by H & W as a tool and die maker from March 16, 1979 to November 14, 1980.[10] In September 1980 Rugito was appointed Union Vice-President, Chief Steward, Grievanceman and Agent. His active involvement in his two-month tenure as a Union officer included the filing of several grievances over discharged Union officers, complaints over workplace conditions, and a dues payment problem. (App. 106, 114, 116). On November 14, 1980, following a hearing over one of those grievances—the discharge of employees Robert Broker and Roger Cottrell—Giannotti handed Rugito a suspension pending discharge based on nine unexcused absences.[11] Rugito then obtained two excuses from his doctor relating to his July 8 and 14 absences. He brought the doctor's excuses to H & W on November 17, 1980. H & W rejected his excuses because (1) the excuses showed visits to the doctor on July 9 and 15, whereas he had been absent from work on July 8 and 14,[12] and (2) Rugito had waited "all those months" (from July to November 1980) to obtain the excuses, whereas "ninety percent or more" of the

employees bring in excuses the next day or the day after. (App. 579).

The General Counsel relied on Rugito's aggressive Union activity and H & W's refusal to accept the two medical excuses in support of its argument that Rugito's absenteeism was a mere pretext for his discharge. The ALJ commented on all of the relevant evidence and concluded that H & W's animus directed against Rugito, as well as the disparate treatment exhibited in rejecting his doctor's excuses, were sufficient to find that H & W violated section 8(a)(1) and (3) of the Act in discharging Rugito. (App. 22).

As we have previously noted, under the *Wright Line* test, the General Counsel was obligated to make a prima facie showing that Rugito's discharge was the result of H & W's antiunion animus. In our view, the General Counsel met his threshold obligation, even though the evidence supporting his prima facie case is limited to one statement made by Giannotti, Rugito's supervisor, to Rugito, and overheard by a co-worker, Brenda May. Despite the fact that this statement was made a week after Rugito had been terminated, we cannot say that it is not entitled to weight, particularly since the ALJ credited the testimony of both Rugito and Brenda May.

The statement made by Giannotti was made to Rugito when he entered the plant to attend a Union meeting more than a week after his discharge. Rugito was asked to leave, and, according to Rugito, Giannotti said that "everything that [he] had done had been bad for the Company." (App. 130, 148). Brenda May testified that Giannotti told Rugito "that he thought whatever office Don took in the Union that he was going to help the relationship be-

---

**10.** In December 1979 he was terminated for excessive absenteeism, but two weeks later the Company offered him the choice of taking sick leave or remaining terminated. He went on sick leave for several weeks, returning to active employment in mid-January 1980.

**11.** UNEXCUSED ABSENCES (1980)

| | | | DISCIPLINED |
|------|------|------|------|
| 3/17 | 3/18 | 4/1 | 4/3 |
| 4/24 | 4/29 | 6/3 | 6/3 |
| 7/8 | 7/14 | 11/6 | 11/12 |

**12.** Rugito explained that he had been too ill to go to the doctor on July 8 and 14, but that he had gone immediately following work on each of the succeeding days. He challenged H & W to verify his story by calling his physician, but H & W never did.

tween the Union and the Company and that in his opinion, he had only heard [sic] it." (App. 323).[13] Giannotti admitted having a confrontation with Rugito, although it was his recollection that he referred to Rugito's "lack of cooperation" in filing the number of verbal grievances he filed. (App. 679). Giannotti's statement is sufficient—although barely so—to carry the General Counsel's initial burden under *Wright Line.* The burden then shifted to H & W to prove that it would have discharged Rugito regardless of his protected Union activities. Although this too is an extremely close question, we cannot say that H & W satisfied its burden.

The record compiled by H & W shows that Rugito had been terminated for excessive absenteeism in 1979, and that he had accumulated eight unexcused absences by the time he became a Union officer. The ALJ was correct in noting that H & W "would not have shown any disparate treatment in discharging him based on a fair application of Rule 30, particularly when it is considered that he should have been concerned about any unexcused absences following his discharge in 1979 for excessive absenteeism." (App. 21). Our evaluation cannot stop there, however, because the ALJ went on to find disparate treatment of Rugito amounting to a violation of section 8(a)(3) and (1).

In order to carry its burden under *Wright Line,* H & W would have had to prove that any employee in Rugito's situation would have been discharged and that no employee would have been permitted to submit excuses four months after an absence. The ALJ found, however, that prior to H & W's refusal to accept Rugito's excuse, "the Company had never rejected a written excuse as untimely." (App. 23) The ALJ apparently discredited the unsupported statement of personnel director Barron that H & W's policy was to reject medical excuses submitted more than "a couple of weeks" after the absence (App. 523–24). In addition, the ALJ pointed to record evidence that H & W had accepted the excuse of one employee, Jeff Speicher, dated two days after the actual date of his absence. (App. 859)[14] The ALJ also pointed to H & W's refusal to verify Rugito's excuses with his physician, thereby underscoring the technicality which it had already waived in Speicher's case.[15] Finally, the ALJ found that one workday prior to Rugito's attempt to hand in the late excuses, H & W "agreed to accept excuses from Broker and Cottrell which would equally have been untimely." (App. 22).[16]

As this court noted in *Behring International, Inc. v. NLRB,* 714 F.2d 291, 292 (3d Cir.1983) (per curiam, opinion on remand), "although we might have resolved the issue differently had we heard it in the first

13. After the conclusion of the hearings, the General Counsel moved to correct the transcript in a number of particulars. In connection with Brenda May's testimony, he sought to have the word "heard" corrected to read "hurt." The ALJ granted this motion in his Opinion of July 29, 1982 (App. 11 *). Accordingly, the testimony of Brenda May was to the effect that Giannotti had thought Rugito would help relations between the Union and H & W, but that Rugito, in Giannotti's opinion, "had only hurt it."

14. "Jeff Speicher was seen 11–19–80 in our office—due to schedule we were unable to see him earlier but in our opinion—condition was severe enough to warrant absence from work 11–17–80."

15. H & W has not argued that it had no responsibility for verifying an employee's excuse with

his physician when asked to do so. We therefore do not decide the issue of whose responsibility it is to verify improperly dated or other facially defective excuses, nor do we address or decide the issue of whether work rules may be promulgated in this connection to dispel any such ambiguity. Because of the context in which the instant dispute has arisen and the state of the record as it has been developed, we will not disturb the ALJ's determination.

16. In making this finding, the ALJ obviously discounted the testimony of Gregory Krivakuca on cross-examination in which he admitted Barron might have said "consider" rather than "accept" late excuses from Broker and Cottrell, and that the offer might have been extended only to one of them. (App. 295). As noted earlier, credibility determinations rest with the ALJ.

instance, our limited scope of review requires us to accept the Board's conclusion that the employer did not meet the burden assigned to it." In this case the Board concluded that H & W did not carry its burden of demonstrating that Rugito would have been discharged in any event without regard to his protected activities. Since there exists substantial evidence in the record to support the ALJ's finding of disparate treatment in violation of section 8(a)(3) and (1), we will enforce that part of the Board's order as pertains to Donald Rugito.

### D. Gregory Krivakuca

■ Gregory Krivakuca was employed by H & W as a molder who ran the Foundry from April 11, 1980 until his discharge on December 22, 1980.[17] He was the only molder in the Foundry and the record reveals that his absence from the Foundry resulted in serious production problems. He served as Union secretary from September 18, 1980 until the date of his discharge, and in that position he claimed involvement in the majority of grievances filed during that period. Krivakuca was terminated in December 1980 at which point he had accumulated nine unexcused absences.[18] The General Counsel argued that Krivakuca was the subject of unlawful discrimination because (1) he had not missed any days of work between the time he received his first disciplinary notice (November 14, 1980) and receipt of his final discharge notice on December 17, 1980, and (2) H & W refused a written excuse for November 7, 10, and 11,

1980, on which dates Krivakuca was caring for his seriously ill son.

The ALJ rejected the first ground urged by the General Counsel. H & W offered testimony to explain why a time lag occurred when a disciplinary slip was issued [19] and how suspensions were specifically timed to minimize interference with the ongoing work in the Foundry. Thus, the fact that Krivakuca returned from a three-day suspension on November 21, 1980 to learn that he was to be suspended for the next five workdays—affording him no time to "improve his attendance record" [20]—is mitigated by the ALJ's finding that Krivakuca "was on constant notice that his attendance record was among the poorest in the plant and that [H & W] was very concerned about it." (App. 24). This finding is substantiated by Krivakuca himself, who testified that everytime he missed a day of work, his supervisor would talk to him about it, (App. 286, 299), including a conversation in September 1980 when Bollman told Krivakuca that H & W "could not put up with a baby-sitter problem any longer" and that "this was the last time that would happen." (App. 279, 299). We therefore agree with the ALJ (and the Board) that H & W did not discriminate against Krivakuca in applying Rule 30 and suspending Krivakuca in November 1980.

As to the second ground urged by the General Counsel, the ALJ found that H & W's rejection of Krivakuca's written excuses for his absence on November 7, 10, and 11 was discriminatory. Krivakuca explained that he stayed home on November 7, 1980 to care for his son. The next day,

---

17. Krivakuca was terminated in May 1980 because of five consecutive absences without notifying H & W as to why he was absent. (App. 590). He was rehired on May 13, 1980, at which time his supervisor (Bollman) warned him about unacceptable absenteeism due to unfortunate baby-sitting problems faced by Krivakuca, a single parent.

18. UNEXCUSED ABSENCES DISCIPLINED (1980)

| | | | |
|---|---|---|---|
| 6/3 | 7/10 | 9/12 | 9/19 (rec'd 11/14) |
| 9/18 | 10/30 | 11/6 | 11/12 (rec'd 11/21) |
| 11/7 | 11/10 | 11/11 | 12/4 (rec'd 12/17) |

19. Although Krivakuca's first disciplinary slip was typed September 19, 1980, it was not given to him until November 14 because "he wasn't there very often in September" and his supervisor "could not afford to have him out of there" once he returned. (App. 594).

20. The disciplinary notices, as a matter of form, all contained the admonition "You are hereby advised that the following improvement or correction will be expected: Improve your absentee record." (App. 773).

Saturday, November 8, Krivakuca took his son to the hospital emergency room and there obtained a "slip," which another employee brought in for him on Monday, November 10. Krivakuca stayed home with the child November 10 and 11, returning to the hospital on November 11 for a follow-up visit as had been recommended by the doctor. (App. 787). On November 12, Krivakuca returned to work, bringing another hospital slip for the previous day. (App. 788). H & W rejected the proffered excuses on November 14 (App. 788). According to Krivakuca, Giannotti stated that excuses from doctors would be accepted only if they were for the employee and not if they were for employees' children. (App. 266).

The ALJ emphasized that "there is a great deal of difference between a baby sitting problem on one hand, and the emergency treatment of a severely ill child on the other." (App. 24). He also noted that H & W had "tolerated absences of other employees who accompanied someone else for medical care." (*Id.*) The ALJ concluded that H & W's "change in attitude" and "sudden hard-hearted attitude" could be attributed only to Krivakuca's protected activities. We disagree.

Even if one concludes that the General Counsel carried his burden of establishing a *prima facie* case—by pointing to (1) other instances where medical excuses were accepted from employees who merely accompanied family members on doctor's visits and (2) the timing of Krivakuca's discharge (immediately following a grievance meeting in which he was a key figure)—we are persuaded that H & W also carried its burden of showing that Krivakuca would have been discharged in any event regardless of his protected activities.

Krivakuca had accumulated six absences prior to his son's illness. He remained home with his son Friday, Monday, and Tuesday, claiming that the examining physician at the hospital told him he had to "make a decision" regarding taking care of his seriously ill son. (App. 269). The hospital report prescribes only bed rest and increased fluid intake, however, thereby belying the ALJ's reference to an extended "emergency" situation. Furthermore, there is no legal principle which prevents a company from making a "hard-hearted" judgment in the face of compelling business justifications. *See Central Freight Lines*, 255 NLRB 509, 510 (1981) ("[H]owever 'compelling' or sympathetic Southerland's reasons for missing work may have been, it was still within [the employer's] province to act on Southerland's absences."). The record reveals that Krivakuca's constant absences from work had severe adverse effects on H & W's production schedule. (App. 591, 650–51). It should be remembered that at that time, Krivakuca was the only molder in H & W's Foundry. As stated by Arbitrator Jenkins in *Phillips Petroleum Company*,

... The Company is entitled to insist on reasonable attendance. While an employee may be perfectly capable of doing a job, the job does not get done by him if he is not there. The Company is entitled to have an employee that will get the job done. If an employee has repeated absences over a long period, even if such absences are justified, he becomes of so little value as to justify his termination.

48 L.A. 402, 404–06 (Jenkins, 1967).

Krivakuca had the worst attendance record of any H & W employee during his eight-month tenure there. (App. 595, 926). He was aware of the production problems his absences caused, had assured his supervisor that the problem would be taken care of, and he had received a "last chance" warning in September 1980. What is more, H & W treated as excused seven of Krivakuca's absences that occurred *after* his appointment to Union office (App. 855, 926). Nothing prohibited H & W from finally drawing a line and strictly enforcing its own work rule, and sympathy for Krivakuca's plight should not color our evaluation

of H & W's conduct with regard to one of its critically important, but constantly absent, employees. Although we sympathize with Krivakuca's unfortunate situation, we also understand an employer's need to employ dependable workers, and we conclude that H & W satisfied its burden of showing that Krivakuca would have been discharged without regard to his Union activities on account of his abysmal attendance record. Finding no substantial evidence to support the Board's contrary conclusion, we therefore decline to enforce that part of the Board's order that dealt with Gregory Krivakuca.

### III.

In sum, we will enforce the order of the Board only as to the suspension of Cole, the discharge of Rugito, and the improper surveillance activities. We will grant H & W's petition for review as to the discharge of Pershing and Krivakuca. Each party will bear its own costs.