801 F.2d 636
 123 L.R.R.M. (BNA) 2464, 55 USLW 2262,
105 Lab.Cas. P 12,045
 D & D DISTRIBUTION COMPANY, A DIVISION OF D & D SEWING
COMPANY, Petitioner in No. 86-3000,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
D & D DISTRIBUTION COMPANY, A DIVISION OF D & D SEWING
COMPANY, Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Petitioner in No. 86-3020.
 Nos. 86-3000, 86-3020.
 United States Court of Appeals,
Third Circuit.
 Argued Aug. 5, 1986.
Decided Sept. 18, 1986.
 
 Francis T. Coleman (argued), Scott R. Merrill, Boothe, Prichard & Dudley, Washington, D.C., for D & D Distribution Co.
 Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate General Counsel, Linda Dreeben, Michael David Fox (argued), Washington, D.C., for N.L.R.B.
 Before SEITZ, ADAMS, and STAPLETON, Circuit Judges.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge:
 
 
 1
 D & D Distribution Company (D & D) appeals an order of the National Labor Relations Board (Board) directing that employee Rick Hock be reinstated and compensated for any loss of earnings. The Board seeks enforcement of its order. The Board found that Hock was fired in retaliation for engaging in "concerted activities" and that D & D thereby committed an unfair labor practice under section 8(a)(1) of the National Labor Relations Act (NLRA), 29 U.S.C. Sec. 158(a)(1) (1982). We hold that the Board's decision was supported by substantial evidence and is in accordance with the applicable law.
 
 
 2
 We have jurisdiction to review the Board's order under 29 U.S.C. Sec. 160(f) (1982). Jurisdiction over the Board's application for enforcement is conferred by 29 U.S.C. Sec. 160(e) (1982).
 
 
 3
 Factual determinations of the Board "if supported by substantial evidence on the record considered as a whole ... [are] conclusive." 29 U.S.C. Sec. 160(e) (1982). The Supreme Court addressed the meaning of "substantial evidence" in Universal Camera Corp. v. Labor Board, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951):
 
 
 4
 "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. Labor Board, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). Accordingly, it "must do more than create a suspicion of the existence of the fact to be established.... it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." Labor Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939).
 
 
 5
 Review of the Board's application of legal precepts to facts is plenary. Allbritton Communications Co. v. NLRB, 766 F.2d 812, 817 (3rd Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 850, 88 L.Ed.2d 891 (1986).
 
 
 6
 D & D contends that the Board's findings are not supported by substantial evidence. In particular, D & D challenges the Board's findings that: 1) Hock's actions were "concerted activities" under Sec. 7 of the NLRA, 2) D & D had knowledge of Hock's protected activities, and 3) Hock's termination was motivated, at least in part, by retaliation for protected activities. D & D also argues that the Board erred when it declined to find that Hock would have been discharged for tardiness and absenteeism even if he had not engaged in protected activity.
 
 
 7
 The following facts were found by the Administrative Law Judge (ALJ) and accepted by a majority of the members of the Board. Chairman Dotson dissented, concluding that there was insufficient evidence to support the finding that D & D had knowledge of Hock's protected activities.
 
 I.
 
 8
 Hock was hired by D & D as a warehouse employee in January 1979. Beginning in early 1981. Hock's attendance and promptness record began to deteriorate. On March 24, 1981, after Hock had been late or absent on over half on the workdays during the first three months of the year, Donald Masemer, D & D's administrative director, specifically warned Hock about his habitual tardiness. Although Hock denied that such a verbal warning was issued, the ALJ credited Masemer's account. On November 16, 1981, after two absences and six late arrivals on eight consecutive days, Masemer issued another warning, this time having Hock sign a memorandum regarding promptness and absenteeism. The memorandum stated in part: "An improvement in your attendance is necessary. Otherwise appropriate disciplinary actions will need to be administered." [169a].
 
 
 9
 Masemer testified that he had issued verbal warnings to Hock on several occasions after the November written warning. Hock denied that these warnings were given, and the ALJ credited Hock.
 
 
 10
 Hock testified that in late January 1982 he was given a good job performance review by Masemer and was offered the position of assistant foreman which he declined to take. The ALJ credited Hock's description of this performance review and offer of promotion over the denials of the D & D company officials.
 
 
 11
 D & D's employee handbook contains a statement concerning absence and tardiness. It provides that, upon the first offense, a verbal warning is given. Upon the second offense, a written warning is issued. After the third offense, the employee is subject to immediate discharge. The ALJ found that in practice "the procedure was not so rigid." [173a] He noted that Masemer's November warning threatened "appropriate disciplinary actions" rather than termination.
 
 
 12
 Beginning in late 1981, Hock began to have conversations with two of his coworkers, Mike Zorbaugh and Troy Shenberger, concerning the adequacy of their wage rates. He complained that the twenty-five cents per hour raise given in April 1981 was too small and stated that they deserved a one dollar per hour raise in April 1982, when the wages would next be reviewed. Similar conversations among these three coworkers continued, and in March 1982, approximately one week before Hock was fired, Hock recommended that they contact a union representative in the event their April pay raise was not satisfactory. Foreman Schaefer was within earshot on the warehouse floor when some of these conversations took place, and in particular when the union representation was mentioned. These findings were based primarily on the testimony of Hock. Schaefer denied overhearing any discussion of union activity.
 
 
 13
 In late 1981, the word "union" and a statement advocating a one dollar per hour pay increase appeared among the graffiti in the men's room of the warehouse. After the wall was repainted in January 1982, the word "union" reappeared. Dallmeyer, the chief executive officer of D & D, testified that he believed Hock had written the graffiti, but that it did not enter into the decision to terminate him because Dallmeyer had no proof that Hock was responsible.
 
 
 14
 On Friday, March 12, 1982, after Hock had been late on Monday, Thursday and Friday of that week, Masemer decided to recommend to Dallmeyer, a co-owner of D & D, that Hock be fired. Dallmeyer was not in his office on the Monday and Tuesday, March 15 and 16, but on the morning of March 17, Dallmeyer and Masemer discussed the proposed discharge and Dallmeyer approved the termination. At the end of the work day, Masemer informed Hock that he was being discharged, indicating that the reason for the discharge was his absences and lateness.
 
 
 15
 Hock went to Dallmeyer to discuss his discharge. The ALJ found that "Dallmeyer told him that the reason for his termination was not really his lateness but that it was more because of his attitude toward the Company that they did not like, but declined to elaborate further." [171a] Dallmeyer gave a conflicting account, but the ALJ credited Hock's version.
 
 
 16
 During the investigation of Hock's charge, Zorbaugh gave a sworn statement that included an account of a conversation he had with Masemer and Schaefer on the day following Hock's discharge. According to that account, which the ALJ credited, Masemer told Zorbaugh that he had said things about the Company that Masemer did not like and that Zorbaugh was either to stop saying them or leave. Masemer also said that he did not like Zorbaugh's attitude toward the company and that if Zorbaugh did not change his attitude they would let him go. At the hearing, both Masemer and Schaefer denied that such statements were made. Zorbaugh recalled Masemer's warning but did not remember any statement concerning his attitude. The ALJ felt that Zorbaugh, who was still employed by D & D at the time of the hearing, was "holding back what he knew in support of the complaint." [166a].
 
 
 17
 Based on these factual findings, the ALJ and the Board concluded that Hock had engaged in concerted activities, that employer knowledge of such activities could be inferred from the evidence, and that anti-union animus, not simply the employee's chronic tardiness, played a role in motivating the termination.
 
 II.
 
 18
 Section 8(a)(1) of the NLRA defines as "unfair labor practices" acts of employers which "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. Sec. 158(a)(1) (1982). Section 7 of the NLRA, 29 U.S.C. Sec. 157 (1982), states that:
 
 
 19
 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection...."D & D contends that Hock's activities were not "concerted activities for the purpose of collective bargaining or other mutual aid or protection," but were instead idle, self-interested complaints.
 
 
 20
 In Meyers Industries, Inc., 268 N.L.R.B. 493, 497 (1984), remanded sub nom. Prill v. NLRB, 755 F.2d 941 (D.C.Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 313, 352, 88 L.Ed.2d 294, 320, the Board held that "to find an employee's activity to be 'concerted,' ... it [must] be engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself." (footnote omitted) Moreover, statements in the nature of complaints, as distinct from the preparation for concerted activity, are not protected.
 
 
 21
 It is not questioned that a conversation may constitute a concerted activity although it involves only a speaker and a listener, but to qualify as such, it must appear at the very least that it was engaged in with the object of initiating or inducing or preparing for group action or that it had some relation to group action in the interest of the employees.
 
 
 22
 Mushroom Transportation Co. v. NLRB, 330 F.2d 683, 685 (3d Cir.1964). Simply complaining about low wages by itself does not constitute "activity." See NLRB v. Office Towel Supply Co., 201 F.2d 838, 841 (2nd Cir.1953).
 
 
 23
 The ALJ found that Hock's conversations concerned the wage rates for at least three of the employees and the desirability of making contact with a union if the next raise was disappointing. Thus, Hock's comments were not merely self-interested and did include a proposal that he and his colleagues pursue concerted activity. We, therefore, conclude that Hock's activities were protected.
 
 
 24
 We also conclude that these factual findings are supported by substantial evidence. The ALJ credited Hock's testimony concerning his own activities. The only contrary testimony came from Zorbaugh who confirmed that the conversation about the upcoming wage increase occurred but denied that Hock spoke other than about his own raise. The ALJ discounted this testimony because he believed Zorbaugh feared for his job and was holding back. Under these circumstances, we will not disturb the Board's finding that Hock engaged in concerted activities.
 
 III.
 
 25
 D & D's termination of Hock was not in violation of Sec. 8(a)(1) unless D & D knew that Hock was engaged in protected activities. The burden of proving knowledge of union or pre-union activity rests squarely on the NLRB, American Manufacturing Associates, Inc. v. NLRB, 594 F.2d 30, 33 (4th Cir.1979), and a finding of knowledge cannot rest alone on "suspicion, surmise, implications, or plainly incredible evidence." Id., quoting Universal Camera Corp. v. Labor Board, 340 U.S. 474, 484, 71 S.Ct. 456, 462, 95 L.Ed. 456 (1951).
 
 
 26
 There is concededly no direct testimony supporting employer knowledge and there is much direct testimony denying it. The evidence of knowledge accepted by the ALJ and the Board, and contested by the dissenting Chairman Dotson, is circumstantial. The ALJ described some of that circumstantial evidence in the following passage:
 
 
 27
 At best Hock could only testify that Schaefer could have overheard some of the conversations and particularly the one within a week of his discharge. Schaefer, Masemer, and Dallmeyer denied knowledge of his activities. The General Counsel points to the small size of the plant and graffiti on the men's room wall, both before and after the wall was repainted, as warranting the inference that Respondent knew of Hock's activity. I find these factors sufficient to support the inference. Moreover, in the light of Dallmeyer's testimony that Respondent believed Hock responsible for the graffiti and Masemer's admonition to Zorbaugh the day after Hock's discharge, I find that the inference should be drawn over the denials of Respondent's officials. I find that Dallmeyer and Masemer knew or had reason to believe that Hock had been talking to other employees about larger than usual wage increases and the possibility of seeking union representation if Respondent did not grant them.
 
 
 28
 [170a].
 
 
 29
 D & D contends that the ALJ misapplied the small shop doctrine. That doctrine enables the Board to infer employer knowledge of union or pre-union activities where the number of employees in the workplace is small.[1] D & D argues that the small shop doctrine applies only where there is "other, affirmative, evidence indicating the likelihood that the employer in fact knew." NLRB v. Joseph Antell, Inc., 358 F.2d 880, 883 (1st Cir.1966). We may accept this assertion for present purposes because, as hereafter indicated, the ALJ in this case credited other testimony from which employer knowledge could be independently inferred. Accordingly, the ALJ's use of the small shop doctrine was appropriate.
 
 
 30
 D & D also maintains that the factual inferences drawn by the ALJ and the Board should not be granted the same high level of deference applied to findings based on direct evidence and credibility determinations. See Board of Publication of the Methodist Church v. NLRB, 297 F.2d 379, 380 (6th Cir.1962) ("The Board's findings of fact are binding upon an appellate court if supported by substantial evidence from the record but factual inferences to have the same conclusive effect must be drawn from undisputed basic facts.") However, the rule in this circuit is otherwise. Where the Board's inferences are reasonable, they are entitled to acceptance on review, Hedstrom Co. v. NLRB, 629 F.2d 305, 316 (3rd Cir.1980), cert. denied, 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981), even if the Court would have drawn a different inference had it been deciding the case de novo. See Kenworth Trucks of Philadelphia, Inc. v. NLRB, 580 F.2d 55, 59 (3rd Cir.1978). This Court may review the inferences made below, but the question to be asked is whether they are reasonable.
 
 
 31
 In this case, the inference that D & D possessed knowledge of Hock's activities is supported by credible evidence that (1) foreman Schaefer was close enough to the conversations to hear them, (2) D & D's warehouse facility was a small one employing only eight or nine individuals, (3) Dallmeyer believed Hock to be responsible for the men's room graffiti, (4) Hock's discharge came only a week after a conversation suggesting a union, (5) Masemer told Hock he was being discharged because of his attitude, and (6) one day after the discharge, Masemer complained about Zorbaugh saying things D & D did not like. Based on this evidence, the ALJ and the Board were not required to credit the denials of knowledge by D & D's management.
 
 IV.
 
 32
 The General Counsel bears the burden of proving, by a preponderance of the evidence, "that the employee's protected conduct was a substantial or motivating factor in the adverse action." NLRB v. Transportation Management Corp., 462 U.S. 393, 401, 103 S.Ct. 2469, 2474, 76 L.Ed.2d 667 (1982). The conclusion of the ALJ and the Board that protected conduct was the motivating factor is supported by findings that: 1) Dallmeyer stated Hock was fired because of his attitude, not for his tardiness; 2) Masemer commented to Zorbaugh about his attitude the day after Hock's termination; and 3) the firing followed closely after Hock's comment about contacting a union. The ALJ discounted D & D's counterargument that the termination was motivated entirely by Hock's tardiness because of findings that: 1) Hock received no warnings about tardiness after November 1981; 2) Hock was not docked for tardiness and was no more than five minutes late on any one occasion in 1982; and 3) Hock was given a positive performance review and offered a promotion in late January 1982. Evaluating the record as a whole we conclude that there is substantial evidence to support the conclusion that Hock's concerted activity was a motivating factor in his discharge.
 
 V.
 
 33
 Even if the General Counsel persuades the Board that protected activities were in fact a motivating factor in the action, an employer can escape liability by showing, as an affirmative defense, that his actions would have been the same regardless of the forbidden motivation. NLRB v. Transportation Management Corp., 462 U.S. 393, 401-02, 103 S.Ct. 2469, 2474-75, 76 L.Ed.2d 667 (1982). D & D argues that the Board erred in failing to accept its contention that Hock would have been discharged for tardiness in any event.
 
 
 34
 There is no dispute that Hock had an abysmal attendance and lateness record. D & D claims that three other employees with less horrendous records had been discharged under the company's tardiness and absenteeism policy and that the company's progressive disciplinary system virtually mandated that Hock be discharged for the same reason. The ALJ analyzed the evidence on which these claims are made and reasonably found them unpersuasive. The conclusion that Hock would not have been fired in March absent improper motivation was based on findings that: 1) there were no warnings concerning tardiness after November; 2) Masemer did not mention tardiness in the January job review; 3) Hock was not docked and was not more than five minutes late in 1982; and 4) the attendance policy was flexible, and did not necessarily require termination, given the warning in the November memorandum of "appropriate disciplinary actions." The ALJ also discounted D & D's claims that three employees had previously been fired for comparable reasons, distinguishing those cases on the facts. We conclude that the Board was justified in finding that D & D was not sufficiently concerned about Hock's record to have discharged him in the absence of his concerted activities.
 
 
 35
 D & D urges that this court's decision in Hanlon & Wilson Co. v. NLRB, 738 F.2d 606, 616-18 (3rd Cir.1984), should guide our decision in this case. In Hanlon & Wilson, this court reversed the Board and found that employee Krivakuca, who was secretary of his union, was fired because of attendance policy violations, not unlawful discrimination. Krivakuca was fired in conformity with company policy that provided for discharge after nine unexcused absences in a calender year. The employer refused to accept a written excuse for three days on which Krivakuca was absent to care for his seriously ill child. The Board had concluded that the company's "sudden hard-hearted attitude," manifested in strict enforcement of the company policy of accepting medical excuses only if the employee himself or herself was ill, could only be attributed to discrimination based on the employee's union activity. Id. at 617. The court found that there was nothing preventing an employer from taking a hard-hearted position with an employee who had the worst attendance record and who was aware of the company's concern for attendance. The court concluded that:
 
 
 36
 Although we sympathize with Krivakuca's unfortunate situation, we also understand an employer's need to employ dependable workers, and we conclude that H & W satisfied its burden of showing that Krivakuca would have been discharged without regard to his Union activities on account of his abysmal attendance record. Finding no substantial evidence to support the Board's contrary conclusion, we therefore decline to enforce that part of the Board's order that dealt with Gregory Krivakuca.
 
 
 37
 Id. at 618.
 
 
 38
 In Hanlon & Wilson, the rules concerning termination for absenteeism were quite specific and Krivakuca "was on constant notice" that his attendance was a problem, supporting Hanlon & Wilson's claim that discharge would predictably occur if the conditions for discharge were met. Id. at 616. There was no substantial evidence to the contrary. In contrast, the ALJ in the instant case found that "repeated lateness," the offense sanctioned by D & D's rules, was an "elastic term" and that the conditions for disciplinary discharge were not rigid. [173a] Moreover, D & D's argument that Hock's lateness alone would have resulted in discharge is undercut by the evidence that Hock, after November, was given no warnings concerning his tardiness, was not docked any pay, and received a positive evaluation and an offer of promotion. Thus, unlike the case of Krivakuca, the Board's conclusion that Hock would not have been discharged in March 1982 in the absence of his concerted activities is supported by substantial evidence.
 
 VI.
 
 39
 This is a fact case in which there was much conflicting testimony. In resolving the factual disputes, the ALJ had to believe one side or the other. He made credibility determinations and, for the most part, credited Hock's testimony. It is not a case, however, where the result rests solely on the testimony of the charging party. The ALJ and later the Board carefully canvassed all of the evidence and found that the circumstantial evidence fitted together in patterns which made Hock's account the more likely one. We cannot fault their performance. Accordingly, we will deny the petition for review and grant enforcement of the order.
 
 ADAMS, Judge, dissenting:
 
 40
 This Court is requried to accept factual determinations of the National Labor Relations Board only "if supported by substantial evidence on the record considered as a whole." 29 U.S.C. Sec. 160(e) (1982). In Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951), the seminal case in this area, the Supreme Court explained that substantial evidence
 
 
 41
 "is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ... Accordingly, it "must do more than create a suspicion of the existence of the fact to be established .... it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury."
 
 
 42
 (quoting Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 216-17, 83 L.Ed. 126 (1938), and National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939)).
 
 
 43
 The Administrative Law Judge here found, in a determination that constitutes the linchpin of the case, that the petitioner had knowledge that Hock had engaged in activities protected under the National Labor Relations Act. On this record I cannot say that this finding is supported by substantial evidence. There is no direct evidence that the petitioner was aware of Hock's activities, and such indirect evidence as exists is inferential, at best. I therefore respectfully dissent from the order of the Court which, despite the fact that Hock's record of absences and lateness is nothing short of deplorable, would require his re-employment with back pay.
 
 
 
 [1]
 "The essence of the small plant doctrine rests on the view that an employer at a small facility is likely to notice activities at the plant because of the closer working environment between management and labor. Alumbaugh Coal Corp. v. NLRB, 635 F.2d 1380, 1384 (8th Cir.1980).' " NLRB v. Health Care Logistics, Inc., 784 F.2d 232, 236 (6th Cir.1986)