**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 14-1571 and 14-2036
_____


800 RIVER ROAD OPERATING CO LLC,
DBA Woodcrest Health Care Center,
Petitioner in No. 14-1571


v.


NATIONAL LABOR RELATIONS BOARD,
Respondent


1199 SEIU UNITED HEALTHCARE WORKERS EAST
NEW JERSEY REGION,
Intervenor

\*Amended Pursuant to Clerk
Order entered 04/22/14

NATIONAL LABOR RELATIONS BOARD,
                    Cross-Petitioner in No. 14-2036

                              v.

800 RIVER ROAD OPERATING CO LLC,
        D/B/A Woodcrest Health Care Center,
                    Cross-Respondent

                    _____

On Petition for Review and Cross-Application
        for Enforcement of an Order of
        the National Labor Relations Board
            (Case No. 22-CA-083628)

                    _____

Argued on January 23, 2015

Before:  RENDELL, SMITH and KRAUSE, Circuit Judges

(Filed: April 29, 2015)


Paul D. Clement, Esq.
William R. Levi, Esq.
Erin Murphy, Esq.   **(Argued)**
Bancroft PLLC
1919 M Street, N.W.
Suite 470
Washington, DC 20036

Rosemary Alito, Esq.
George P. Barbatsuly, Esq.
K & L Gates, LLP
One Newark Center
Tenth Floor
Newark, NJ 07102
        *Counsel for Petitioner/Cross-Respondent 800*
        *River Road Operating Co, LLC*


Kira D. Vol, Esq.
Julie B. Broido, Esq.
Jared D. Cantor, Esq.  **(Argued)**
Linda Dreeben, Esq.
Richard F. Griffin, Jr., Esq.
Jennifer Abruzzo, Esq.
John H. Ferguson, Esq.
National Labor Relations Board
Appellate Court Branch
1099 14th Street, N.W.
Washington, DC 20570
        *Counsel for Respondent/Cross-Petitioner*
        *National Labor Relations Board*

---

O P I N I O N

---

**RENDELL,** <u>Circuit Judge</u>:

Petitioner 800 River Road Operating Co. LLC, d/b/a Woodcrest Health Care Center ("Woodcrest"), seeks review of the National Labor Relations Board ("NLRB" or "Board") decision and order ("Order"), which found that Woodcrest violated § 8(a)(1) and (a)(3) of the National Labor Relations Act, 29 U.S.C. §§ 151-169 ("NLRA" or "Act"), by ommitting various unfair labor practices. *Woodcrest Health Care Ctr.*, 360 N.L.R.B. No. 58 (Feb. 27, 2014). The NLRB cross-petitions for enforcement of the Order. The charging party in the underlying Board proceeding, 1199 SEIU United Healthcare Workers East New Jersey Region ("Union"), intervened in this appeal in support of the Order.

In January 2012, the Union petitioned for an election to unionize some of Woodcrest's employees. The election was held in early March 2012. The Union charged that certain conduct of Woodcrest before and after the election constituted unfair labor practices. This conduct included: (1) withholding of election-eligible employees' benefits, (2) coercively interrogating employees, and (3) creating an unlawful impression of surveillance. Woodcrest lost before the Board and now appeals the Board's rulings. We will vacate in part, affirm and enforce in part, and remand for further consideration in light of this opinion.

## I.   Background

Woodcrest is a limited liability corporation engaged in the business of operating a rehabilitation and nursing facility. On January 23, 2012, the Union filed a petition for an election to determine whether certain employees of Woodcrest would unionize. The election was held on March 9, 2012, and the employees voted to unionize. Woodcrest filed objections to

the election, and the Union filed a charge against Woodcrest alleging that Woodcrest committed various unfair labor practices in violation of § 8(a)(1) and (a)(3). The NLRB issued a first amended complaint against Woodcrest, and the case was tried before an Administrative Law Judge ("ALJ") in Newark, New Jersey.

The ALJ found that Woodcrest committed unfair labor practices by withholding benefits from election-eligible employees and by engaging in three coercive interrogations of election-eligible employees, but that Woodcrest did not create an unlawful impression of surveillance in another exchange with an employee. Woodcrest, the NLRB, and the Union each filed exceptions to the ALJ's decision. On appeal, the Board affirmed the ALJ's decision with respect to the benefit withholding and interrogation claims, but it reversed with respect to the surveillance claim. Thus, the Union emerged successful on all of the charges. Woodcrest appeals, and the NLRB cross-appeals for enforcement of the Order.

## II.   Jurisdiction

We have jurisdiction over Woodcrest's petition for review pursuant to § 10(f) of the NLRA and over the NLRB's cross-petition for enforcement pursuant to § 10(e). *See* 29 U.S.C. § 160(e)-(f).[1]

---

[1] On appeal, for the first time, Woodcrest asserts that the interrogations were protected by the First Amendment. This argument implicates § 8(c) of the NLRA, which incorporates First Amendment principles into the statutory scheme. *See* 29 U.S.C. § 158(c) ("The expressing of any views, argument, or

5

## III. Standard of Review

"We afford considerable deference to the Board." *Grane Health Care v. NLRB*, 712 F.3d 145, 149 (3d Cir. 2013). The Supreme Court "has emphasized often that the NLRB has the primary responsibility for developing and applying national labor policy." *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 786 (1990). Courts will uphold the Board's interpretation of the NLRA "as long as it is

---

opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."). A § 8(c) challenge comes too late: it is not properly before us because it was not raised before the Board and therefore § 10(e) deprives us of jurisdiction over it. *See NLRB v. FES*, 301 F.3d 83, 88-89 (3d Cir. 2002); *see also* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."). First Amendment arguments, on the other hand, might not be barred, because we have an obligation "to read statutes to avoid serious constitutional problems." *See Sandoval v. Reno*, 166 F.3d 225, 237 (3d Cir. 1999). Even assuming we may entertain a separate First Amendment argument at this point, however, we consider such an argument immaterial to our ruling, as the concept of coercive versus permissible speech has been the focus of Woodcrest's argument all along. Viewing this issue through the lens of the First Amendment, or § 8(c), would add little or nothing to our ruling.

rational and consistent with the Act." *Id.* at 787. Thus, in addressing the benefit withholding issue, we ask whether the Board's rules are rational and consistent with the NRLA.

The Supreme Court has also explained that, "if the Board's application of such a rational rule is supported by substantial evidence on the record, courts should enforce the Board's order." *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 42 (1987); *see also* 29 U.S.C. § 160(e). "'Substantial evidence' has been defined by the Supreme Court as simply 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hedstrom Co. v. NLRB*, 629 F.2d 305, 313 (3d Cir. 1980) (en banc) (quoting *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966)). We will not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). In sum, our standard of review is "highly deferential." *United Food & Commercial Workers Union Local 204 v. NLRB*, 506 F.3d 1078, 1083 (D.C. Cir. 2007). Thus, our question regarding the claims of coercive interrogation and unlawful impression of surveillance is whether, under this highly deferential standard, substantial evidence supports the Board's conclusions.

## IV. Discussion

### A. Benefit Withholding

Woodcrest was found to have violated § 8(a)(1) and (a)(3) of the NLRA by withholding benefits from employees

eligible to vote in the Union election. Section 8(a)(1) establishes that it is "an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158(a)(1). Section 8(a)(3) establishes that it is "an unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." *Id.* § 158(a)(3).

### 1. *Background*

The parties stipulated before the ALJ as to the evidence relevant to the benefit withholding issue. HealthBridge Management, LLC ("HealthBridge") manages Woodcrest, along with three other health care centers. The four health care centers provide a common health insurance plan for their employees. Effective January 1, 2012, that plan underwent changes resulting in reduced benefits and increased costs for employees. HealthBridge received numerous complaints about these changes and decided to adopt certain improvements to the health insurance plan, as well as to reduce employee premiums.

Four days before the Union election, on March 5, 2012, Woodcrest's administrator directed the distribution of a memorandum to all Woodcrest employees, except those eligible to vote in the March 9 election. The memorandum announced that improvements would be made to the health insurance plan for employees not eligible to vote in the upcoming election and that the changes would be retroactive to January 1, 2012.

8

Election-eligible employees discovered that their coworkers were receiving these improvements, and they inquired, shortly after the election, as to their eligibility for these benefits. Woodcrest told the election-eligible employees that "we cannot negotiate your contract, your benefits, your insurance because right now you are in the critical period with the Union" and "we cannot discuss this matter at this time." (J.A. 384-85.)

The ALJ found that "[t]he evidence establishes [Woodcrest] took the action it did, toward certain employees, because they were not involved in a representation campaign and failed to take action toward other of its employees specifically because they were involved in such a campaign." (J.A. 386.) Because Woodcrest would have granted the improvements to the election-eligible employees *but for* the election, the ALJ found that Woodcrest's conduct violated § 8(a)(1) and (a)(3) of the NLRA. However, the ALJ did not make any finding as to Woodcrest's motivation or its justification for its actions.

The ALJ explained that, "[a]s a general rule, an employer, in deciding whether to grant benefits while a representation election is pending, should decide that question as it would if a union was not in the picture." (*Id.*) He noted that the Board's jurisprudence had created a safe harbor in these situations whereby an employer may "postpone such a wage or benefit adjustment so long as it [makes] clear to employees that the adjustment would occur whether or not they select a union, and that the sole purpose of the adjustment's postponement is to avoid the appearance of influencing the election['s] outcome." (*Id.* (first alteration in original) (quoting *Retlaw Broad. Co.*, 302 N.L.R.B. 381, 382

9

(1991)) (internal quotation marks omitted).) Woodcrest did not follow the course set forth in the safe harbor, which, the ALJ reasoned, left "its unit employees with a clear impression they were deprived of these system wide benefits because of their section 7 rights."[2] (*Id.*) In effect, the safe harbor was treated as a sword: Woodcrest violated the NLRA because it did not comply with the safe harbor.

The Board, on appeal, "affirm[ed] the [ALJ's] findings, for the reasons set forth in his decision, that [Woodcrest] violated Section 8(a)(1) and (3) of the Act by announcing and implementing a reduction in healthcare premiums and copays for all employees except those who were eligible to vote in the representation election." (J.A. 18.) The Board provided no discussion of its own regarding the relevant law.[3]

---

[2] The ALJ's remedy for this violation was for Woodcrest: (1) to cease and desist from "[i]mplementing reductions in healthcare premiums and copays that specifically excludes employees eligible to vote in the representation election"; (2) to affirmatively "[i]mplement the changed healthcare benefits for the unit employees effective January 1, 2012, and make whole its unit employees for losses they may have suffered as a result," which includes "out-of-pocket losses, if any, suffered by any unit employee that had to drop health coverage because of the failure of [Woodcrest] to provide the new reduced premiums and copays," and interest; and (3) to post a notice that describes Woodcrest's obligations under the NLRA. (J.A. 387-90.)

[3] The Board's only modification to the relief awarded by the ALJ was to require Woodcrest "to compensate employees for the adverse tax consequences, if any, of receiving lump-sum backpay awards and to file a report with the Social Security

*2. Analysis*

Section 8(a)(3) makes it "an unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment or any term or condition of employment *to encourage or discourage membership in any labor organization*." *Id.* § 158(a)(3) (emphasis added). Thus, to find a § 8(a)(3) violation, consideration must be given to the employer's motive. The Supreme Court has held, time and again, that a violation of § 8(a)(3) normally turns on an employer's antiunion purpose or motive. "That Congress intended the employer's *purpose in discriminating* to be controlling is clear." *Radio Officers' Union of Commercial Telegraphers Union, A.F.L. v. NLRB*, 347 U.S. 17, 44 (1954) (emphasis added); *see also Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 311 (1965) ("It has long been established that a finding of violation under this section will normally turn on the employer's motivation."); *NLRB v. Brown*, 380 U.S. 278, 287 (1965) ("We have determined that the 'real motive' of the employer in an alleged § 8(a)(3) violation is decisive . . . ." (quoting *Associated Press v. NLRB*, 301 U.S. 103, 132 (1937))). Congress's intent is clear both in the plain text of the statute and in the legislative history. *See, e.g.*, *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 33 (1967) ("The statutory language 'discrimination . . . to . . . discourage' means that the finding of a violation normally turns on whether the discriminatory conduct was motivated by an antiunion purpose." (alterations in original) (quoting 29

Administration allocating the backpay awards to the appropriate calendar quarters for each employee." (J.A. 18 n.3.)

11

U.S.C. § 158(a)(3))); *Radio Officers' Union*, 347 U.S. at 44 (describing the NLRA's legislative history).[4]

However, under certain circumstances, actual proof of an improper antiunion motive has been held to be unnecessary. Specifically, "two categories of § 8(a)(3) violations . . . do not require *proof* of motive." *NLRB v. Hudson Transit Lines, Inc.*, 429 F.2d 1223, 1229 (3d Cir. 1970) (emphasis added). "First, if an employer's conduct is 'inherently destructive' of important employee rights, no proof of anti-union motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that his conduct was motivated by business considerations." *Id.* at 1227-28. "Second, if the employer's conduct could have adversely affected employee rights to some extent[,] the employer must establish that he was motivated by legitimate objectives," and, if he does not, "the conduct constitutes an unfair labor practice 'without reference to intent.'" *Id.* at 1228 (quoting *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 380 (1967)). If the employer does proffer a substantial and legitimate business justification for the different treatment, however, it can be overcome by proof of antiunion motive, notwithstanding an otherwise legitimate justification.

---

[4] An antiunion motivation must be found for a § 8(a)(1) violation in the benefits context. *See NLRB v. Hudson Transit Lines, Inc.*, 429 F.2d 1223, 1227 n.8 (3d Cir. 1970) ("In certain limited factual situations, such as the promise of benefits by an employer before a representation election, a showing of improper motivation has been required to establish a violation of § 8(a)(1).").

12

In *Great Dane*, the Supreme Court provided a thorough explanation of how the Board should analyze an alleged violation of § 8(a)(3). 388 U.S. at 33-34. As a threshold matter, it must make a finding as to whether the employer engaged in one of two kinds of "discriminatory conduct which could have adversely affected employee rights to *some* extent." *Id.* at 34. That is, first, if the Board finds the employer's conduct to be "'inherently destructive' of important employee rights," then the Board may presume an unlawful motive. *Id.* The employer then would have the opportunity to demonstrate "counter explanations" for its conduct, although the Board "may nevertheless draw an inference of improper motive from the conduct itself" and find an unfair labor practice, if doing so would "strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy." *Id.* at 33-34. Second, if the Board finds instead that the employer's conduct fell short of the "inherently destructive" category—i.e., "the adverse effect of the discriminatory conduct on employee rights is 'comparatively slight'"—then the burden shifts to the employer to "come forward with evidence of legitimate and substantial business justifications for the conduct." *Id.* at 34. If it does not do so, it will be found to have violated § 8(a)(3). *Id.* However, if the employer meets this burden, then the burden shifts back to the charging party or the NLRB to present "specific evidence" of the employer's intent to discourage Union membership. *Id.*; *see also Brown*, 380 U.S. at 287 (describing when "specific evidence of intent to discourage union membership is necessary to establish a violation of § 8(a)(3)").

13

We are at a loss as to why the Board's operative test—tailored to the safe harbor—failed to address any of these issues. The Board's failure to make a finding as to the nature of the effect on employee rights or the reason for, or purpose of, Woodcrest's different treatment of the election-eligible employees cannot be reconciled with what the Supreme Court has instructed the ALJ and the Board to do. Instead, the Board treated the § 8(a)(3) (and § 8(a)(1)) inquiry as a "but for" test—i.e., asking only whether the employees would have received benefits but for the Union's presence—rather than considering the nature of the discrimination or the employer's purpose. *See, e.g.*, *McCormick Longmeadow Stone Co.*, 158 N.L.R.B. 1237, 1243 (1966) ("[I]n withholding the wage increase because of the Union's failure to waive its right to file a charge, the Company deprived them of benefits they would have enjoyed but for their resort to self-organization. This . . . violates Section 8(a)(1) . . . and hence violates Section 8(a)(3)."); *see also Noah's Bay Area Bagels, LLC*, 331 N.L.R.B. 188, 203 (2000); *Honolulu Sporting Goods Co., Ltd.*, 239 N.L.R.B. 1277, 1295 (1979). This test is inconsistent with what the Board was required to do, and the record was not developed regarding the issues that should have been determinative.[5]

---

[5] We know that Woodcrest separated out the election-eligible employees for different treatment because it was election time. However, the Board made no attempt to determine the reason Woodcrest decided to award benefits to some employees at the time and in the manner that it did. Woodcrest's argument that it did not have an antiunion motivation would be exceedingly weak if all it could say was that it was following faulty legal advice. While Woodcrest may have felt constrained by the election, its difficulty

Given that we are specifically disapproving of the reasoning that the Board has repeatedly relied on in finding benefit discrimination to violate § 8(a)(3) (and § 8(a)(1)), we will remand for the Board to consider these issues in the first instance. *See United Dairy Farmers Coop. Ass'n v. NLRB*, 633 F.2d 1054, 1069 (3d Cir. 1980). Remand is appropriate because we are requiring the Board to modify its longstanding mode of analysis in order to comply with the Supreme Court's equally longstanding precedent to the contrary. *See United States v. Kikumura*, 918 F.2d 1084, 1103 n.23 (3d Cir. 1990), *overruled on other grounds by United States v. Fisher*, 502 F.3d 293 (3d Cir. 2007).

## B. The Interrogations

Section 8(a)(1) of the NLRA also prohibits an employer from coercively interrogating its employees—that is, interrogating them in such a way as to "suggest[] to the employees that the employer may take action against them because of their pro-Union sympathies." *Frito-Lay, Inc. v. NLRB*, 585 F.2d 62, 65 (3d Cir. 1978); *see also Graham Architectural Prods. Corp. v. NLRB*, 697 F.2d 534, 537 (3d Cir. 1983) ("An employer's questioning becomes coercive and runs afoul of section 8(a)(1) when it 'suggests to the

---

navigating the law in and of itself is not a sufficient business justification for its conduct. *See St. Francis Fed'n of Nurses & Health Prof'ls v. NLRB*, 729 F.2d 844, 852 (D.C. Cir. 1984) ("The fact that Hospital management scrupulously avoided promising a wage increase until their legal staff gave the go-ahead indicates only that they received dubious legal advice, not that the announcement was lawful.").

employees that the employer may take action against them because of their pro-Union sympathies.'" (quoting *Frito-Lay*, 585 F.2d at 65)). Although "the questioning must reasonably have tended to coerce under the circumstances," it need not have "actually had any coercive effect." *Graham Architectural*, 637 F.2d at 537-38. "Whether an employer's actions meet that test is a question of fact for the Board and its determinations are conclusive if supported by substantial evidence." *NLRB v. Armcor Indus., Inc.*, 535 F.2d 239, 242 (3d Cir. 1976). As noted above, "substantial evidence" is a "highly deferential" standard of review. *United Food & Commercial Workers Union*, 506 F.3d at 1083.

Here, three interrogations form the basis of the coercive interrogation charge. The participants in these three interrogations were: (1) certified nursing assistant Jeffrey Jimenez and company attorney James Monica; (2) certified nursing assistant Judith Dolcine and Assistant Director of Nursing Ansel Vijayan; and (3) licensed practical nurse Donna Duggar and supervisor Janet Lewis. The ALJ found that each of these interrogations was coercive. He explained that "[t]he applicable test for determining whether questioning an employee constitutes unlawful interrogation is the totality-of-the-circumstances test." (J.A. 375.) He used the "*Bourne* factors" to assess the totality of the circumstances. (*Id.* (citing *Bourne v. NLRB*, 332 F.2d 47, 48 (2d Cir. 1964)).) These factors, which we discuss below, include "an examination or consideration of the background of the interrogation; the nature of the information sought; the identity of the questioner; the place and method of the interrogation; and, the truthfulness of any reply." (*Id.*) Applying these factors, the ALJ concluded that Woodcrest had engaged in coercive interrogations and ordered it to cease

16

and desist from "[i]nterrogating its employees about their union membership, activities, and sympathies" and to post a notice that Woodcrest "WILL NOT coercively interrogate you regarding your union membership, activities, and sympathies." (J.A. 388, 390.)

On appeal, the Board "agree[d] with the [ALJ], for the reasons he states, that [Woodcrest] violated Section 8(a)(1) of the Act by coercively interrogating employees both during the Union's campaign to organize employees at [Woodcrest's] rehabilitation and nursing facility and after the Union's certification as the employees' bargaining representative." (J.A. 18.)

The facts of the three interrogations are set forth below.

### 1. *Jimenez-Monica*

Jimenez was a vocal and visible supporter of the Union. Approximately two weeks after the election, Jimenez's supervisor approached him while he was caring for patients. The supervisor told him that the Director of Nursing wanted to see him in her office. He obliged and went to her office, but only Monica was there. Monica said he was an attorney for Woodcrest investigating whether any supervisors engaged in objectionable conduct in favor of the Union. He handed Jimenez a form document, which Jimenez signed. The form document included the following language: "[t]he only purpose I have in interviewing you is to investigate whether any objectionable conduct occurred in connection with the election held here at Woodcrest on March 9, 2012 and the events leading to that election during the previous

17

weeks and months"; "[w]e are <u>not</u> interested in determining whether you are for or against the Union or if, or how, you voted in the election"; and "[w]e positively assure you that you have the right to join or not to join any labor organization without fear of reprisals." (J.A. 377.) Monica asked Jimenez whether any supervisors had been involved with the Union, had passed out cards for the Union, or had influenced him in any way to change his vote. He asked if any representative for the Union had gone to Jimenez's house and if Jimenez "knew any employees who were involved in a union or passing out cards." (J.A. 376.) He also asked Jimenez if he had signed a card for the Union. Jimenez refused to identify the employees who had supported the Union. Jimenez left the room but then returned, clearly upset, tore up the signed form document, and threw it in the garbage.

Approximately five days later, Jimenez's supervisor approached him, again while he was caring for patients, and informed him that Monica wished to see him in a conference room. When Jimenez arrived, Monica told Jimenez that he did not believe his answers during their first meeting and wanted to give him a second chance to be truthful. Monica repeated many of the same questions, but also asked why Jimenez wanted to form a union. Jimenez answered Monica's questions, and the interrogation ended without further incident.

### 2. *Dolcine-Vijayan*

In the month before the election, Vijayan approached Dolcine while she was on duty at her workstation and asked to speak with her privately. Vijayan was "a high-level manager." (J.A. 375.) Years prior, Vijayan had hired

18

Dolcine. During their meeting, Vijayan handed Dolcine a "don't vote union" flyer and asked her if anyone from the Union had visited or telephoned her at her home. She answered no but said she supported the Union. Vijayan asked her why she needed the Union, and she responded that she needed someone to back her up if something happened or she was fired. Vijayan told her that was not going to happen.

### 3. Duggar-Lewis

Sometime before the election, Lewis, who was "not a top-level manager," attended a management meeting in which Woodcrest's management discussed whether certain employees supported the Union. (J.A. 383.) An attorney at the meeting mentioned that Duggar supported the Union. Lewis, who was friends with Duggar, was surprised and so decided to ask Duggar if the attorney's statement were true. When asked, Duggar told Lewis that she did not support the Union. The conversation was amicable. Lewis then reported to management that Duggar did not support the Union. There is no evidence that Lewis told Duggar about the management meeting or indicated that she would report Duggar's response.

### 4. Analysis

Given our deferential standard of review as to whether substantial evidence supports the Board's finding that Woodcrest violated § 8(a)(1) by coercively interrogating its employees, we will affirm that at least one of these interrogations was coercive. Specifically, substantial evidence supports the Board's conclusion that the Monica-Jimenez interrogation was coercive.

19

Section 8(a)(1) provides: "It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158(a)(1). The Board considers the *Bourne* factors in determining whether, under the totality of the circumstances, the questioning was coercive. *See, e.g.*, *Rossmore House*, 269 N.L.R.B. 1176, 1178 n.20 (1984). The *Bourne* factors are:

> (1) The background, i.e. is there a history of employer hostility and discrimination?
> (2) The nature of the information sought, e.g. did the interrogator appear to be seeking information on which to base taking action against individual employees?
> (3) The identity of the questioner, i.e. how high was he in the company hierarchy?
> (4) Place and method of interrogation, e.g. was employee called from work to the boss's office? Was there an atmosphere of "unnatural formality"?
> (5) Truthfulness of the reply.

*Bourne*, 332 F.2d at 48. The *Bourne* factors provide a framework, albeit not a required checklist, to use when assessing a purportedly coercive interrogation. *Rossmore House*, 269 N.L.R.B. at 1178 n.20; *see also United Servs. Auto. Ass'n v. NLRB*, 387 F.3d 908, 916 (D.C. Cir. 2004) ("Requiring the Board to address each of the *Bourne* factors . . . would transform a flexible tool for organizing section 8(a)(1) analysis into a rigid hurdle divorced from its purpose of ensuring that non-threatening interrogation is not deemed an unfair labor practice."). The factors are useful in

assisting the adjudicator to consider the totality of the circumstances, so we hold that the ALJ's and the Board's use of the *Bourne* factors to assess whether a given interrogation is coercive is rational and consistent with the NLRA.

Here, notwithstanding that the Board found that three employer-employee interactions constituted unlawful interrogations, it takes just a single coercive interrogation to support the remedy ordered by the Board—namely, a cease and desist order and the posting of a notice that Woodcrest will not coercively interrogate its employees. Because the Order gives only a single remedy for all three violations, as long as at least *one* of the three interrogations amounted to coercion, we will enforce this part of the Order.

The ALJ and the Board's conclusion that at least one of the interrogations violated § 8(a)(1) is supported by substantial evidence. Specifically, we will not disturb the conclusion that the Monica-Jimenez interrogation constituted a coercive interrogation in violation of § 8(a)(1). The interrogation was initiated by Woodcrest ostensibly to determine whether any supervisors had engaged in improper conduct. Jimenez's supervisor told him that the Director of Nursing wanted to see him in her office, but, when Jimenez entered the Director's office, she was not there. Instead, Monica, a lawyer for Woodcrest, was there to conduct an exceedingly formal interview. Monica gave Jimenez a written statement that he was asked to sign. The written statement assured Jimenez that "[t]he only purpose I have in interviewing you is to investigate whether any objectionable conduct occurred in connection with the election held here at Woodcrest . . . and the events leading to that election," and that "[w]e are not interested in determining whether you are

21

for or against the Union or if, or how, you voted in the election." However, the lawyer asked him *whether he had signed a card* for the Union and whether he knew any other unit employees (i.e., election-eligible employees, not supervisors) who were involved in the Union or passing out cards. (J.A. 377.) These unwanted questions upset Jimenez so much that he returned to the office after leaving the meeting and "tore up the document and threw it in the garbage." (J.A. 376.) Then, approximately five days later, Jimenez's supervisor again approached Jimenez while he was working and told him to meet with the lawyer in a private conference room. The lawyer told him that "he did not believe Jimenez'[s] answers during their first exchange and wanted to give him a second chance." (J.A. 377.) He asked Jimenez *why he wanted Woodcrest to unionize* and whether certain supervisors had campaigned for the Union.

Woodcrest argues that the Monica-Jimenez interrogation was found to be coercive solely because Monica asked Jimenez why he wanted a union at Woodcrest. But we disagree. The ALJ and the Board found the interrogation to be coercive based on the totality of the circumstances, properly applying the *Bourne* factors. Woodcrest's citations are off-point. Woodcrest cites *Hughes & Hatcher, Inc. v. NLRB* for the proposition that "[i]nterrogation of employees concerning their membership in the union, membership of fellow-employees, or the general activity of the union, absent interference or coercion, does not violate the Act." 393 F.2d 557, 563 n.4 (6th Cir. 1968). However, the circumstances here were not so benign. Monica's questioning of Jimenez regarding topics that Monica was purportedly not to inquire about, along with the accusation that Jimenez had not told the truth, crossed the line. *Cf. NLRB v. Prof'l Tape Co.*, 422 F.2d

22

989, 990 (7th Cir. 1970) ("This was not a mere inquiry to determine Union support. The continuous questioning of Hawkins and Okryesik suggested that the employees were being accused of lying about the union activities and in so doing, the Company created an atmosphere of antagonism toward the Union."). Indeed, the ALJ and the Board found that the circumstances of Monica's questioning, taken as a whole, "reasonably tend to interfere with the free exercise of employee rights under the Act" and were coercive. (J.A. 374.) Given the substantial evidence standard, we are not inclined to disturb this conclusion.

Moreover, the Monica-Jimenez interrogation has parallels to an interrogation discussed in *Graham Architectural*, which we held was unlawful. There, the interrogation of David Reisinger by Michael Lehr was "not part of an ordinary casual conversation; rather, Lehr specifically requested Reisinger to come to his office." *Graham Architectural*, 697 F.2d at 538. The supervisor also "indicated that he had prior knowledge" of the employee's union activities. *Id.* Furthermore, that interrogation involved two mitigating factors that are not present here: the individuals' "friendship and the occurrence of the conversation in an open plant area." *Id.* Yet we, nevertheless, enforced the Board's order. *Id.* at 543. Here, Jimenez did not know Monica, and the interrogation occurred first in Jimenez's boss's office and then in a private conference room.

The Monica-Jimenez interrogation was also similar to a second interrogation found to be unlawful in *Graham Architectural*—the interrogation of Diana Oberdick by her supervisor, Robert Reichard—which also involved "not a

23

casual inquiry into a co-worker's feelings, but a request from which a reasonable inference can be drawn that it was aimed at securing specific information concerning the genesis of the union campaign and the identity of the leaders," making it "not unreasonable for the Board to conclude that under these circumstances Reichard's question may have conveyed to Oberdick the message that the Company was contemplating retaliation against the union activists who were responsible for the organizing campaign." *Id.* at 538-39. Jimenez could easily have assumed that Monica's question regarding which unit employees were engaged in Union activities indicated that Woodcrest was contemplating taking some action against the pro-Union employees who were responsible for the organizing campaign. Accordingly, substantial evidence supports the Board's conclusion that this interrogation was unlawful.[6]

---

[6] Nothing in this opinion should be misinterpreted as indicating that asking employees meaningful questions, including probing for bias and testing credibility, during an internal investigation necessarily violates the NLRA. Internal investigations, especially when conducted by outside counsel, serve an important function, and, in some circumstances, an employer's legitimate business justification for an interview in connection with an internal investigation may be sufficiently substantial to overcome the coercive effect of an interview on employees' union activities. *See, e.g.*, *Textile Workers Union of Am. v. Darlington Mfg. Co.*, 380 U.S. 263, 268-69 (1965) (recognizing that a substantial business justification can outweigh the interference with employee's rights and overcome § 8(a)(1) charges); *Jeannette Corp. v. NLRB*, 532 F.2d 916, 918 (3d Cir. 1976) (same). We need not engage the argument in this case, however, because no

The coerciveness of the remaining two interrogations is less clear, although, as stated above, Woodcrest loses if a single interrogation was coercive. In particular, the conversation between Duggar and Lewis hardly seems coercive. All we know about the Lewis-Duggar conversation is that "sometime after February 5, but before the representation election," at some unstated place, Lewis asked Duggar "if she was in favor of the Union," and Duggar replied truthfully that she was not. (J.A. 383.) Lewis "was not a top-level manager," and "she and Duggar telephoned each other outside of work and are friends." (J.A. 382-83.)

This conversation is analogous to a conversation that we found to be lawful in *Graham Architectural*—the interrogation of Darlene Stambaugh by Greg Nash. There, a supervisor "called [Stambaugh] over to his desk and asked her whether she was for the Union." *Graham Architectural*, 697 F.2d at 539. They then had an extended discussion about "the advantages and disadvantages of the Union." *Id.* Like here, "[t]he question itself contained no veiled threat or implication that the Company contemplated reprisals against union supporters." *Id.* Here, the only evidence that the ALJ found of coercion was that Lewis reported Duggar's response to management, yet there is no indication that Lewis gave Duggar any reason to suspect that she would do so. Thus, that fact cannot be relevant to whether the "questioning must reasonably have tended to coerce under the circumstances." *Id.* at 537-38. The NLRB's only case law to the contrary is from another interrogation in *Graham Architectural* in which we said that, *considering all the other indicia of coercion*, a

such business justification was asserted by Woodcrest before the Board or on appeal.

25

supervisor's friendly manner is insufficient to overturn the Board's finding that substantial evidence supports a finding of coercion. *See id.* at 538-39. But here, there were no other indicia of coercion.

The Vijayan-Dolcine conversation falls between these two extremes. Unlike the Lewis-Duggar conversation, the Vijayan-Dolcine conversation involved a "high-level manager," who approached a unit employee "at her workstation while she was on duty and asked to speak with her privately." (J.A. 375.) Vijayan gave Dolcine an antiunion flyer and "ask[ed] about her union activities including why she needed a union." (J.A. 376.) Given the formality of the conversation, the power dynamic, and the fact that Vijayan made it clear to Dolcine (by giving her the antiunion flyer) what Vijayan's views were and what Dolcine's answer should be, the Board may well have had substantial evidence to support its conclusion that the interrogation was coercive, although we need not find more than one interrogation coercive for the result here.

Because at least one interrogation was coercive, we will affirm and enforce this part of the Order.[7]

---

[7] We note that the remedy imposed was imprecise. The Board ordered Woodcrest to cease and desist from "[i]nterrogating its employees about their union membership, activities, and sympathies" (J.A. 20, 388), but the Notice to Employees, which the Board required Woodcrest to post, states that Woodcrest "WILL NOT *coercively* interrogate you regarding your union membership, activities, and sympathies" (J.A. 20, 390 (emphasis added)). To the extent that the remedy could be misconstrued as prohibiting employee

C.  Unlawful Impression of Surveillance

Woodcrest was found to have violated § 8(a)(1) of the NLRA by creating an unlawful impression of surveillance. "Conduct which gives the impression of surveillance violates section 8(a)(1) if the conduct reasonably tends to interfere with, restrain, or coerce employees in the exercise of their section 7 rights." *Hanlon & Wilson Co. v. NLRB*, 738 F.2d 606, 613 (3d Cir. 1984).

*1. Background*

Here, the surveillance claim relates to two interactions between Jimenez and Assistant Director of Recreation Vladamir Guerrero that occurred after the election.  In the first interaction, Guerrero told Jimenez, "I heard your name; your name has been popping out a lot." (J.A. 18.)  In the second interaction, which occurred approximately a month later, Guerrero saw Jimenez in the lunch room and said, "Oh it's the famous boy." (*Id.*)  Jimenez followed Guerrero into the latter's office.  Guerrero said that the Director of Nursing had distributed a memorandum about a newspaper article containing pro-Union statements by Jimenez and had mentioned his name several times at a management meeting.  Crucially, Guerrero then told Jimenez, "they're pretty pissed" about the article, so "watch [your] back, be careful, careful about what you say, you know, do what you have to do, come to work early, and then just, you know, do your job and go home." (J.A. 380.)  He said Jimenez should "tone it down a

interrogations that are not *coercive*, we clarify that the cease and desist order applies only to coercive interrogations.

little bit" and keep his pro-Union views "under wraps." (J.A. 18.)

The ALJ explained that the Board's test for unlawful-impression-of-surveillance claims is "whether an employee would reasonably assume from the statement(s) in question [that] his or her union activities have been placed under surveillance." (J.A. 381.) The ALJ rejected the claim of unlawful impression of surveillance because Jimenez was a "very visible and vocal supporter of the Union" and Guerrero's statements do not establish that Woodcrest "was observing or monitoring him or his activities more closely." (*Id.*)

On appeal, the Board reversed under a totality of the circumstances test. The Board faulted the ALJ for "not address[ing]" Jimenez's "uncontradicted testimony that Guerrero warned him to 'watch [his] back, be careful, careful about what you say . . . do what you have to do, come to work early, and then just . . . do your job and go home,' or Guerrero's testimony that he advised Jimenez to 'tone it down a little bit,' and to keep his views about the Union 'under wraps.'" (J.A. 19 (alterations in original).) These comments "would reasonably be understood by Jimenez as a warning that [Woodcrest] was moving from routine observation to closely monitoring the degree and extent of his union activity, open or not, and if he continued to engage in such activity, he could face reprisals." (*Id.*)

The Board's remedy for this violation was for Woodcrest to cease and desist from "creating the impression that employees' union and other protected concerted activities were under surveillance." (J.A. 20.) The Board also

28

amended the required notice to employees so that it reads: Woodcrest "WILL NOT create the impression that your union and other protected concerted activities are under surveillance." (*Id.*)

### 2. Analysis

Section 8(a)(1) prohibits employers from giving the "impression of surveillance" if doing so "reasonably tends to interfere with, restrain, or coerce employees in the exercise of their section 7 rights." *Hanlon & Wilson*, 738 F.2d at 613. "There need not be actual interference or coercion to have a section 8(a)(1) violation." *Id.* "'The significant fact . . . is whether [the supervisor's] statement had a reasonable tendency to discourage the employees in exercising their statutory rights by creating the impression that he had sources of information about their union activity.'" *Id.* (alterations in original) (quoting *Overnite Transp. Co.*, 254 N.L.R.B. 132, 133 (1981)).

We have had several opportunities to consider unlawful impression of surveillance claims. In *Hanlon & Wilson*, we found that substantial evidence supported the Board's determination that the employer had created an unlawful impression of surveillance in violation of § 8(a)(1) where an employee was told that "[w]e hear you are trying to get the steel workers in here." *Id.* In *Frito-Lay*, we found that substantial evidence supported the Board's determination that the employer had created an unlawful impression of surveillance by telling an employee that "he 'understood' from 'an individual' and that he had 'heard . . . rumors' that Hunter was starting a union." 585 F.2d at 66 (alteration in original). In *Landis Tool Co., Division of Litton Industries v.*

29

*NLRB*, we found that substantial evidence supported the Board's determination that the employer had created an unlawful impression of surveillance because, inter alia, a foreman told two employees "that he knew they had signed union cards and that employee Miller was a union instigator." 460 F.2d 23, 25 (3d Cir. 1972).

Here, the Board emphasized Guerrero's warning to Jimenez to "watch [your] back, be careful, careful about what you say . . . do what you have to do, come to work early, and then just . . . do your job and go home," and to "tone it down a little bit" and to keep your views about the Union "under wraps."[8] (J.A. 19 (second and third alterations in original).) The Board also emphasized Guerrero's comments to Jimenez that "I heard your name; your name has been popping out a lot" and that he is "the famous boy" whom management had named "several times at a management meeting." (J.A. 18.) Together, these comments suffice to establish that this part of the Order is supported by substantial evidence. The Guerrero-Jimenez interaction is, if anything, more indicative of an unlawful impression of surveillance than were the conversations in *Hanlon & Wilson*, *Frito-Lay*, and *Landis Tool*. In those three cases, a supervisor had told an employee that the company was aware of the employee's union activities. Here, not only did Guerrero indicate that Woodcrest was aware of Jimenez's activities, but he actually told him to watch his back and keep his pro-Union views

---

[8] The fact that the Board disagreed with the ALJ on this issue does not make the Board's conclusion any more suspect; it does not alter our standard of review. *See Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812-13 (3d Cir. 1986).

under wraps. These statements had a reasonable tendency to discourage Jimenez in exercising his statutory rights by creating the impression that Woodcrest had sources of information about his union activity. *See Hanlon & Wilson*, 738 F.2d at 613.

Woodcrest argues that Guerrero's "tone it down a little bit" and "watch [your] back" comments did not convey an unlawful impression of surveillance, but rather conveyed an unlawful threat, which would not support an unlawful impression of surveillance charge. However, it is an eminently reasonable inference that these comments conveyed an unlawful impression of surveillance. "Watch your back" implies that someone else is watching. Guerrero was not merely reporting information that Jimenez had voluntarily provided. Guerrero affirmatively told Jimenez that he should watch his back and be "careful about what you say." (J.A. 19.) Moreover, he urged him to avoid being where he could be observed engaging in pro-Union activity— "just . . . do your job and go home." (J.A. 18 (alteration in original).) These comments would cause a reasonable person to suspect that his actions are under surveillance and were specifically meant to encourage Jimenez to "tone . . . down" his activities in support of the Union. (J.A. 19.) This is the sort of coercion prohibited by § 8(a)(1), and the Board's decision is therefore supported by substantial evidence. Accordingly, we will affirm and enforce this part of the Order.

## V.  Conclusion

We will affirm and enforce the Order with regard to the Board's conclusions that Woodcrest violated § 8(a)(1) by

31

coercively interrogating at least one of its employees and by creating an unlawful impression of surveillance. We will vacate the Order insofar as it concluded that Woodcrest's withholding of benefits from unit employees violated § 8(a)(1) and (a)(3), and will remand for further consideration in light of this opinion.